## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) ) ) | No. CV 07-372 TUC JMR |
| Plaintiff, | ) ) | No. CV 08-335 TUC JMR (consolidated) |
| vs. | ) ) | |
| DIRK KEMPTHORNE, Secretary of the Interior, et al., | ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) ) | |
| DEFENDERS OF WILDLIFE, | ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | |
| DALE HALL, Director, U.S. Fish and Wildlife Service, et al., | ) ) ) | |
| Defendants | ) ) | |
| _____ | ) | |

Pending before the Court in this consolidated matter are competing motions for

summary judgment. Plaintiffs Defenders of Wildlife ("DOW") and Center for Biological

Diversity ("CBD") filed their motions for summary judgment on August 14, 2008 (Doc. Nos.

44 & 45). Defendants filed their cross-motion for summary judgment on October 6, 2008

(Doc. No. 53). All parties filed their respective responses and replies, and oral argument was heard on March 23, 2009.

Plaintiffs claim that the Endangered Species Act, 16 U.S.C. §§1531-1544 ("ESA"), mandates that the Secretary of the Interior ("Secretary") designate critical habitat and prepare a recovery plan for the jaguar (*Panthera onca*); they contend that the Secretary's failure to do either is unlawful. Defendants, to the contrary, maintain that, based upon the administrative record, their scientific expertise, and the relevant statutory and regulatory standards, they reasonably declined to designate critical habitat and develop a recovery plan for the jaguar. For the reasons stated herein, Plaintiffs' Motions for Summary Judgment (Doc. Nos. 44 & 45) are **GRANTED** in **PART** and **DENIED** in **PART**, and Defendants' Cross-Motion for Summary Judgment (Doc. No. 53) is **DENIED**. This matter is remanded for further consideration of available scientific research and reports.

**<u>Factual and Procedural Background</u>**[1]

The jaguar (*Panthera onca*) is the largest species of cat native to the Western hemisphere. 62 Fed. Reg. 39147 (July 22, 1997). Jaguars are generally buff-colored with distinctive black rosettes and can grow as large as 2.5 meters when standing on all fours; they have massive heads, wide chests, and heavy-set bodies with powerful limbs. SAR 143.[2] The

---

[1] The scope of review is limited to the administrative record in this matter. As there are no genuine issues of material fact as such, the Court hereby adopts and summarizes the statements of facts submitted by the parties.

[2] References to the administrative record in this order are to the RAR (Original Recovery Plan Administrative Record), the CAR (Original Critical Habitat Administrative Record), and the SAR (Supplemental Administrative Record).

range of the species stretches from southernmost Arizona and New Mexico south throughout North, Central, and South America. 62 Fed. Reg. 39147; 71 Fed. Reg. 39335 (July 12, 2006); SAR 1146-1149, 1195. Jaguars are top predators in the ecosystems they inhabit and provide important services for these ecosystems in their predation of various ungulates and rodents. 62 Fed. Reg. 39150. They are habitat generalists and utilize a wide range of habitat types. CAR 7. Habitat suitable for jaguar breeding is not readily distinguishable from habitat suitable for other jaguar behavior, CAR 7; RAR 506, and while habitat preferences of female jaguars are narrower than those of their male counterparts, they are otherwise similar. RAR 5028.

Jaguars in the United States historically occupied portions of California, Arizona, New Mexico, Texas, and possibly Louisiana. 71 Fed. Reg. at 39335; SAR 1148. The last jaguar sightings in California and Louisiana were documented in the late 1800s or early 1900s, 71 Fed. Reg. 39335; SAR 1148, and the last record of a jaguar in Texas was in Kleberg County in 1948. RAR 414, 497. Jaguars were known to southwestern Indians and were widely reported in historical frontier accounts, and frontier hunters and biologists considered jaguars to be "thinly scattered but widespread residents" of Arizona well into the 20th Century. CAR 750. Studies recording jaguar kills in Arizona are consistent with the overexploitation of a resident jaguar population, rather than the exploitation of a transient population. CAR 749-750. The range and numbers of jaguars in the United States has declined due to habitat loss and fragmentation, direct persecution (including through predator control), destruction of riparian corridors and other areas used as movement corridors, and

the introduction of livestock in historic jaguar range. 62 Fed. Reg. 39154-55; RAR 506, 4906 (jaguar decline in United States attributed to indiscriminate killing by federal, state, and private predator control programs).

While jaguars have been documented as far north as the Grand Canyon,[3] sightings in the late 20th century to the present have occurred mainly along the international boundary of the United States and Mexico. 71 Fed. Reg. 39335; SAR 1148. From 1996 to 2007, four male jaguars were documented in the United States. Of those four, in 1996, two male jaguars were photographed in the United States: one on March 7, in the Peloncillo Mountains, located along the Arizona-New Mexico border, and another on August 31, in the Baboquivari Mountains in southern Arizona. 71 Fed. Reg. 39335; SAR 1154. In February 2006, a jaguar was observed and photographed in Hidalgo County, New Mexico. SAR 1154. Using remote trail cameras, jaguars were photographed in the United States near the Arizona-Mexico border beginning in 2001, and as recently as July 2007. 71 Fed. Reg. 39335; SAR 471. Researchers obtained 69 photographs of jaguars, 5 video clips, and 28 sets of jaguar tracks during this time period, leading them to conclude that the jaguars were part of a resident and not a dispersing or transient population. SAR 792-800. The sightings indicate that some male jaguars may reside permanently in the United States. 71 Fed. Reg. 39335-36. The four or five jaguars periodically spotted in

---

[3] A jaguar was observed in 1990 by two scientists in the northern portion of the Gila National Forest, RAR 1127, and a 1997 Fish and Wildlife Service ("FWS") report cited "reasonably reliable reports" of jaguars in mountain ranges in Graham and Gila counties in central Arizona. These separate sightings are both distant from the borderland area. RAR 505.

the United States since 1996 are part of a larger population, or populations, that are found predominantly in Mexico. 71 Fed. Reg. 39335; SAR 1148, 1152. Males in the Mexican jaguar population tend to be more broadly distributed than females due to dispersing or non-territorial males in search of areas without male competitors. SAR 107. Only three female jaguars with kittens have been documented in the United States, the last in 1910. 71 Fed. Reg. 39335. No females have been confirmed in the United States since 1963. *Id*. There has been no recent evidence of breeding, or even presence of female jaguars in the U.S. since the current sightings began in 1996, SAR 57, although the absence of confirmed observations of female jaguars is not unusual. RAR 2935 (camera projects even in high occupancy jaguar areas in the tropics rarely observe females).

ESA Listing

The Service originally listed the jaguar as an endangered foreign species (one not occurring in the United States) in 1972 under the ESA's predecessor, the Endangered Species Conservation Act, Pub. L. No. 91-135, 83 Stat. 275 (Dec. 5, 1969), and later proposed the jaguar for listing in 1979 and 1994. 59 Fed. Reg. 35674 (July 13, 1994). In September 1996, Plaintiff Center for Biological Diversity filed suit to compel the Secretary to make a final listing decision for the jaguar. The Service listed the jaguar as an endangered species in U.S. territory on July 22, 1997. Final Rule to Extend Endangered Listing Status for the Jaguar in the United States, 62 Fed. Reg. 39147 (July 22, 1997). In determining that jaguars within the U.S. should be listed as an endangered species, the FWS found that the species met four of the five statutory factors contained at

section 4(a)(1) of the ESA, 16 U.S.C. § 1533(a)(1): (1) the present or threatened destruction, modification, or curtailment of its habitat or range; (2) overutilization for commercial, recreational, scientific, or educational purposes; (3) the inadequacy of existing regulatory mechanisms; and (4) other natural or manmade factors affecting its continued existence. 62 Fed. Reg. 39154.[4] The FWS placed particular emphasis on the maintenance of cross-border wildlife corridors along the U.S.-Mexico border as a critical element in ensuring the species' recovery within the U.S. *Id*. ("Clearing of habitat, destruction of riparian areas, and fragmentation or blocking of corridors may prevent jaguars from recolonizing previously inhabited areas . . . [although] there is currently no known resident population of jaguars in the United States, wanderers from Mexico may cross the border and take up residency in available habitat."). Additionally, the FWS noted at that time that illegal shooting was a primary threat to the jaguar as a species. 62 Fed. Reg. 39147.

Critical Habitat Designation

The FWS found in its 1997 Final Listing Rule that critical habitat for the jaguar was "not prudent," based on the fact that the main threat to the jaguar in the United States was from taking. The FWS concluded that "[p]ublication of detailed critical habitat maps and descriptions in the Federal Register would likely make the species more vulnerable" to taking. 62 Fed. Reg. at 39155. Additionally, the FWS justified its decision not to

---

[4] The fifth factor not relied upon by FWS was "disease or predation."

-6-

designate critical habitat by committing to address the identification of species' habitat preferences "through the recovery process." *Id*. In 2003, the Center for Biological Diversity challenged the Secretary's "not prudent" determination for jaguar critical habitat designation. As part of a settlement agreement in the suit, the Secretary agreed to revisit the jaguar critical habitat designation at a later date. CAR 1. The FWS later reviewed the rationale for the original "not prudent" finding and determined it was no longer valid because the Arizona Game and Fish Department ("AGFD") and other parties had begun publishing "specific and general locations of jaguars through web sites, public notifications, reports, books, and meeting notes." Determination that Designation of Critical Habitat is Not Prudent for the Jaguar, 71 Fed. Reg. 39335-36. Nevertheless, on July 12, 2006, the FWS reaffirmed its decision not to designate critical habitat, citing several reasons: 1) only four or (at most) five males were documented in the United States from 1996 to 2006, and these individual jaguars are likely using areas within the United States sporadically for foraging, not for permanent habitat; 2) "no breeding has been confirmed in the United States since 1910, and only three females with young have ever been documented," the last in 1963; 3) the "area in the United States that is sporadically used by jaguars is only a small part of the range of the northernmost population(s), which are based in Mexico, and appears to be less than one percent of the current range of the species"; 4) the best available scientific information suggests no area within the United States that is critical for the survival of the species; 5) the range of the jaguar in the United States is not enough area to provide for the conservation (i.e., recovery) of the

jaguar or even make a significant contribution to the conservation of the jaguar, and cannot be defined as essential to the conservation of the species; and 6) "any conservation actions for the jaguar that may bring the species to the point that the measures of the Act are no longer necessary will need to be implemented in Mexico and Central and South America." 71 Fed. Reg. 39337. Based upon the foregoing, the FWS concluded that there are no habitats within the jurisdiction of the United States that meet the definition of critical habitat. *Id*.

Recovery Planning

The FWS has yet to develop or implement a recovery plan for the jaguar. The FWS has assigned the jaguar a recovery priority of 5c under its "Recovery Priority Guidelines." RAR 3085; 48 Fed. Reg. 43098 (Sept. 21, 1983). These guidelines require a three-part analysis based on degree of threat, recovery potential, and taxonomy. 48 Fed. Reg. 43103. After Congress amended the ESA in 1982 to add section 4(f)(1)(A), the FWS accordingly amended the recovery planning guidelines to include a "conflict criterion" as a fourth factor "which, if applicable, elevates the species in priority for development of a recovery plan." *Id*. at 43104. Under the recovery priority guidelines, the "5" means the jaguar faces a high degree of threat, and the "c" means its conservation may be in conflict with proposed development projects. In 2007, the FWS determined that the jaguar met the conflict criterion under its own guidance and section 4(f) of the ESA, noting that "[c]onstruction of fences (both pedestrian and vehicle barriers) along the Arizona-Sonora border may impede movement of jaguars between the U.S. and Mexico."

RAR 3084.  The identification of this conflict further "elevated the species in priority."
*Id*.

Notwithstanding the FWS classification, the agency determined on December 21, 2007 that the "development of a formal recovery plan . . . would not promote the conservation of the jaguar."  Recovery Plan Decision (4(f) letter), SAR 572-575.  The FWS noted that the ESA requires recovery plans to include objective and measurable delisting criteria and an implementation schedule with estimated costs and responsible parties which, when fully met and implemented, would lead to the removal of the species from the endangered list, indicative of recovery.  SAR 573.  The FWS determined that because the area within the U.S. occupied by jaguars represents less than one percent of the jaguar's range, and because the U.S. has little authority to implement actions needed to recover the species abroad, any conceivable recovery actions "taken within the United States are likely to benefit a small number of individual jaguars peripheral to the species, with little potential to effect recovery [i.e., promote the conservation] of the species as a whole."  SAR 572.  The FWS further concluded that "[d]evelopment of a recovery plan under the limited authority of the United States would not add measurable value" to jaguar conservation efforts in other countries, including Costa Rica, Mexico, and Brazil.  SAR 574.

The FWS determination relied on the 2004 draft "Endangered and Threatened Species Recovery Handbook" ("draft guidance" or "Recovery Handbook") developed by the FWS in conjunction with the National Marine Fisheries Service ("NMFS").  SAR

572-575.  The draft guidance provides that  acceptable justifications for an exemption

from having a recovery plan include the following situations: (1) delisting is anticipated

due to extinction or listing error; (2) "the species' current and historic ranges occur

entirely under the jurisdiction of other countries, i.e. it is a foreign species; or (3) "other

circumstances that are not easily foreseen, but in which the species would not benefit

from a recovery plan."  SAR 1040.  The January 7, 2008 4(f) letter declining to prepare a

recovery plan expressly relies on the second and third rationales.  In that letter, the FWS

stated that although the jaguar is not an exclusively foreign species, it qualified as such

with respect to formal recovery planning, because a "recovery plan for this largely

international species will not promote its conservation."  SAR 573.   Furthermore,

although its own draft guidance defines species occurring in both the U.S. and foreign

countries as transnational and contemplates such a category as deserving of special

treatment with respect to recovery preplanning considerations, SAR 1040-1041, the FWS

concluded that the "other circumstances" exemption applied to jaguars, because any

"conservation actions for the jaguar that may bring the species to the point that the

measures of the Act are no longer necessary will need to be implemented throughout

Mexico and Central and South America," as the "area represented in the United States

and Mexico is not large enough to provide for the conservation and recovery of the

species."  SAR 574.

**Standard of Review**

 Summary judgment is appropriate if there is no genuine issue regarding any

material fact and if the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In this case the facts are undisputed and contained in the administrative record filed by the federal defendants, including the original recovery plan administrative record ("RAR"), the critical habitat administrative record ("CAR"), and the supplemental recovery plan administrative record ("SAR").  Only legal issues remain and summary judgment is appropriate.  *Northwest Motorcycle Assoc. v. U.S. Dept. Of Agriculture*, 18 F.3d 1468, 1472 (9th Cir. 1994).

Because the ESA does not prescribe its own standard of review, courts have adopted the "arbitrary and capricious" standard set out by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.  *Aluminum Co. of America v. Bonneville Power Admin.*, 175 F.3d 1156, 1160 (9th Cir. 1991).    Under this standard, a court shall "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. 706(2)(A); *see also Center for Biological Diversity v. Kempthorne*, 466 F.3d 1098, 1103 (9th Cir. 2006).  An agency decision will be found to be arbitrary or capricious if the agency

> has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983);
*see also Mendenhall v. Nat'l Trans. Safety Bd.*, 92 F.3d 871, 874 (9th Cir. 1996) (abuse of discretion exists when an agency's decision is based on an erroneous conclusion of law or when record contains no evidence on which agency could have rationally based its decision). A court "must determine whether the agency articulated a rational connection between the facts found and the choice made," and because the APA scope of review is a narrow one, it may not merely substitute its own judgment for that of the agency. *Arizona Cattle Growers' Association v. U.S. Fish and Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001). The standard presumes agency action to be valid and a court should affirm agency action "if a reasonable basis exists" for the agency's decision. *Independent Acceptance Company v. State of California*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks and citations omitted); *see also Lands Council v. McNair*, 537 F.3d 981, 993-994 (9th Cir. 2008) (improper for a court to act as an independent panel of scientists when conducting APA review of agency decisions; a court is to be most deferential to agency decisions which involve a high level of technical expertise, especially those calling for predictions at the frontiers of science).

Nevertheless, a court "must not rubber stamp . . . administrative decisions that [it deems] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocates v. U.S. Army Corps of Engineers*, 402 F.3d 846, 859 (9th Cir. 2005) (internal quotation marks and citations omitted). Although an

agency's factual findings are entitled to substantial deference, courts are the final

authorities regarding statutory interpretation, and issues of statutory construction are

reviewed de novo. *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837,

843 n. 9 (1984) ("The judiciary is the final authority on issues of statutory construction

and must reject administrative constructions which are contrary to clear congressional

intent."); *see also Blackfeet Tribe v. U.S. Department of Labor*, 808 F.2d 1355, 1357 (9th

Cir. 1987). A court must refrain from supplying a "reasoned basis for the agency's action

that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal

quotation marks and citations omitted). Rather, a court must "engage in a careful,

searching review to ensure that the agency has made a rational analysis and decision on

the record before it." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917,

927 (9th Cir. 2008).

**Legal Standard**

Endangered Species Act

Congress enacted the ESA to protect and conserve endangered and threatened

species. 16 U.S.C. § 1531(b). The ESA is "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation." *Tennessee Valley*

*Authority v. Hill*, 437 U.S. 153, 180 (1978). The Supreme Court has stated that "beyond

doubt . . . Congress intended endangered species to be afforded the highest of priorities,"

and the "plain intent of Congress in enacting [the] statute was to halt and reverse the trend

toward species extinction, whatever the cost." *Id*. at 174, 184.[5]

Conservation under the ESA is broadly defined as "the use of all methods and procedures that are necessary to bring any endangered or threatened species to the point at which the measures provided pursuant to the Act are no longer necessary." 50 C.F.R. § 424.02(c); 16 U.S.C. § 1532(3). To that end, as a necessary first step in halting species' extinction, Congress directed the Secretaries of Commerce and the Interior to list threatened and endangered species. A "threatened species" is one that "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). An "endangered species" is one that "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). The ESA requires the issuance of regulations listing species as endangered or threatened based upon the present or threatened destruction, modification, or curtailment of a species' habitat or range; overutilization for commercial, recreational, scientific, or educational purposes; disease or predation; the inadequacy of existing regulatory mechanisms; or other natural or manmade factors affecting the species' continued existence. 16 U.S.C. § 1533(a)(1). Once a species is listed under ESA Section 4, it is afforded a number of protections, including the Section 7 consultation requirement and the Section 9 takings prohibition. In addition to these protections, the Secretary is

---

[5] "The pointed omission of the type of qualifying language previously included in endangered species legislation reveals a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tennessee Valley Authority*, 437 U.S. at 185.

required, absent certain limited exceptions, to designate critical habitat and prepare a recovery plan for the species in question.

*Critical Habitat*

The ESA requires the Secretary, concurrently with listing a species as endangered or threatened, to designate "critical habitat" 16 U.S.C. § 1533(a)(3). Such designation "triggers mandatory consultation requirements for federal agency actions involving critical habitat." *Natural Resources Defense Council v. U.S. Department of the Interior*, 113 F.3d 1121, 1127 (9th Cir. 1997). The designation of critical habitat is "the principal means for conserving an endangered species, by protecting not simply the species, but also the ecosystem upon which the species depends." *Center for Biological Diversity v. Norton*, 240 F.Supp. 2d 1090, 1101 (D. Ariz. 2003) (internal quotation marks and citations omitted). In fashioning the ESA, it was Congress' understanding that "the preservation of species' habitat is essential to the preservation of the species itself." *Id.* at 1098.

"Critical habitat" is defined as:

> (i) the specific areas within the geographical area occupied by the species at the time it was listed in accordance with the provisions of section 1533 of this title, on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

> (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of section 1533 of this title, upon a determination

by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A).  In determining critical habitat areas, ESA regulations provide

that the Secretary shall consider

those physical and biological features that are essential to the conservation of a given species and that may require special management considerations or protection. Such requirements include, but are not limited to the following:

(1) Space for individual and population growth, and for normal behavior;

(2) Food, water, air, light, minerals, or other nutritional or physiological requirements;

(3) Cover or shelter;

(4) Sites for breeding, reproduction, rearing of offspring, germination, or seed dispersal; and generally,

(5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species.

When considering the designation of critical habitat, the Secretary shall focus on the principal biological or physical constituent elements within the defined area that are essential to the conservation of the species. Known primary constituent elements shall be listed with the critical habitat description. Primary constituent elements may include, but are not limited to, the following: roost sites, nesting grounds, spawning sites, feeding sites, seasonal wetland or dryland, water quality or quantity, host species or plant pollinator, geological formation, vegetation type, tide, and specific soil types.

50 C.F.R. § 424.12(b).  Critical habitat designations and amendments are to be based on

"the best scientific data available," 16 U.S.C. § 1533(b)(2), and the Secretary is to make

critical habitat designations to the "maximum extent prudent and determinable." 16

U.S.C. § 1533 (a)(3)(A).  Critical habitat is deemed "not prudent" if the "species is

threatened by taking or other human activity, and identification of critical habitat can be

expected to increase the degree of such threat to the species," or if designation "would not

be beneficial to the species."   50 C.F.R. § 424.12 (a)(1)(i-ii).  The Ninth Circuit has

determined that Congress intended the imprudence exception to be a narrow one, invoked

only in rare circumstances.  *See Natural Resources,* 113 F.3d at 1126 ("The fact that

Congress intended the imprudence exception to be a narrow one is clear from the

legislative history . . .").[6]

*Recovery Plan*

Pursuant to Section 4(f)(1) of the ESA, the Secretary is required to "develop and

implement plans . . . for the conservation and survival of endangered species . . . unless he

finds that such a plan will not promote the conservation of the species."   16 U.S.C. §

---

[6] *See* H.R. Rep. No. 95-1625 at 17 (1978) ("The committee intends that in most situations the Secretary will . . . designate critical habitat at the same time that a species is listed as either endangered or threatened.  It is only in rare circumstances where the specification of critical habitat concurrently with the listing would not be beneficial to the species."); *Enos v. Marsh*, 769 F.2d 1363, 1371 (9th Cir. 1985) (holding that the Secretary "may only fail to designate a critical habitat under rare circumstances"); *Northern Spotted Owl v. Lujan*, 758 F. Supp. 621, 626 (W.D. Wash 1991) ("This legislative history leaves little room for doubt regarding the intent of Congress: The designation of critical habitat is to coincide with the final listing decision absent extraordinary circumstances.").

1533(f)(1).  In crafting recovery plans the Secretary is directed, to "the maximum extent

practicable," to "give priority to those endangered species or threatened species, without

regard to taxonomic classification, that are most likely to benefit from such plans,

particularly those species that are, or may be, in conflict with construction or other

development projects or other forms of economic activity."  16 U.S.C. § 1533(f)(1)(A).

A recovery plan must contain three essential elements: (1) a description of site specific

management actions that may be necessary to recover the species; (2) objective and

measurable criteria which, when met, would result in a determination that the species be

removed from the list; and (3) estimates of the time and cost required to carry out those

measures needed to recover the species and to achieve intermediate steps towards that

goal.  16 U.S.C. § 1533(f)(1)(B)(i)-(iii).

      The Ninth Circuit has affirmed that Congress did not intend the ESA "merely to

forestall the extinction of species (i.e. promote a species survival), but to allow a species

to recover to the point where it may be delisted."  *Gifford Pinchot Task Force v. U.S. Fish

and Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir. 2004).  The recovery plan, once

prepared, provides this "basic road map to recovery, *i.e.*, the process that stops or reverses

the decline of a species and neutralizes threats to its existence."  *Defenders of Wildlife v.

Babbitt*, 130 F.Supp. 2d 121, 131 (D.D.C. 2001) (internal quotation marks and citations

omitted); *see also S.W. Center for Biological Diversity v. Bartel*, 470 F. Supp. 2d 1118,

1136 (S.D. Cal. 2006) ("The statutory scheme contemplates orderly and timely

progression of action to list the species; designate its critical habitat; and create a recovery

plan."). The Recovery Handbook prepared by the FWS and NMFS states that there "are very few acceptable justifications" for a recovery plan exemption, and provides that "a determination that an exemption is warranted should be well documented in the administrative record." SAR 1040.

## Legal Analysis

*Critical Habitat*

Plaintiff CBD challenges Defendant's determination that the designation of critical habitat for the jaguar would not be prudent. CBD asserts that (1) the decision is inconsistent with the requirements of the ESA, (2) Defendants did not use the best scientific information available regarding jaguars, and (3) Defendants did not properly consider the benefits of critical habitat designation in reaching its decision. Defendants contend that their "not prudent" determination is supported by the ESA, the regulations, and the administrative record, and assert that the designation of critical habitat would not benefit the species as a whole.

In its July 22, 1997 Final Listing Rule extending endangered status to the jaguar in the United States, the FWS determined that the designation of critical habitat for the jaguar would not be prudent because the primary threat to the jaguar at that time was from taking, and thus the designation of critical habitat could actually have made the species more vulnerable, a situation clearly at odds with the purpose of the ESA. 62 Fed. Reg. 39155. The Final Listing Rule also stated that the "[a]ppropriate parties and landowners have been notified of the location and importance of protecting this species' habitat," and

further indicated that "[i]dentification of this species' habitat preferences will be addressed through the recovery process." *Id.* Between that time and the publishing of the FWS' July 12, 2006 Prudency Determination, however, the research efforts of various entities, including the Jaguar Conservation Team and the Arizona Game and Fish Department, led to the widespread publication of the general and specific locations of apparently resident jaguars in the United States, nullifying the original FWS justification for declining to designate critical habitat. Accordingly, in its 2006 Prudency Determination, the FWS stated that the takings concern was "no longer valid." 71 Fed. Reg. 39336. In lieu of a takings justification, the FWS concluded that critical habitat designation would not be beneficial to the species as a whole, as the FWS could not find any areas or features essential to the conservation of the jaguar in the United States that met the statutory definition of critical habitat. This was a departure from FWS' rationale ten years earlier. Based upon a comprehensive review of the administrative record, however, and as discussed below, because the FWS determination does not appear to be based upon the best scientific evidence available, and because it is inconsistent with the statutory mandate of the ESA, its own regulations, and relevant case law, it must be set aside.

<u>The FWS Did Not Base Its Determination on the Best Scientific Evidence Available</u>

The FWS proffered a host of reasons in its Prudency Determination for declining to designate critical habitat for the jaguar, all supporting its overall conclusion that critical habitat could not be identified for the jaguar in the United States, and all based upon its

review of the best available science. The FWS stated that "only five transient males have been documented in the United States" and that these jaguars are "likely using areas within the United States sporadically for foraging"; researchers have confirmed no breeding activity in the United States since 1910, and only three female cubs have ever been documented here; the areas in the United States where jaguars have been observed are at the extreme northern limit of the species' range; the best available scientific evidence suggests that no area in the United States is critical for the species as a whole; and the jaguar's range throughout the United States represents less than one percent of its overall range throughout the Western Hemisphere, and is therefore too small to be considered critical. Based upon these factors, the FWS further concluded that the "recovery of the species as a whole depends on conservation efforts in Mexico and Central and South America," and not on any such efforts taken here in the United States. 71 Fed. Reg. 39337. As described below, a review of the record compels the conclusion that the determination not to designate critical habitat for the jaguar was not based upon the best scientific information available.

Defendant relied heavily on a 1997 article by jaguar expert Alan Rabinowitz, the Director of Science at the Wildlife Conservation Society based at the Bronx Zoo. In that article, entitled "The Status of Jaguars (*Panthera onca*) in the United States: Trip Report," Dr. Rabinowitz stated that "the southwestern United States has, at least in recent times, never [sic] more than marginal habitat at the extreme northern limit of the jaguar's range." CAR 809. In that same article Dr. Rabinowitz opined that the jaguar should

immediately be classified as federally endangered in the United States (as it was shortly thereafter), but he cautioned against designating critical habitat at that time. While Dr. Rabinowitz based this last recommendation primarily upon practical and social considerations, he did conclude that "[a]vailable data and examination of the habitat in the borderlands region also suggest that there is no area in the United States that is critical for the *survival* of the jaguar." CAR 811 (emphasis added). These statements by Dr. Rabinowitz, however, are not dispositive. First, as acknowledged by FWS biologist Mark Crites, Dr. Rabinowitz based his "marginal habitat" remarks not upon habitat characteristics, as would be required by the ESA in determining whether to designate critical habitat, but rather upon "other information." CAR 273. Second, when Dr. Rabinowitz concluded that there is no area in the United States that is critical for the survival of the jaguar, he referred only to survival. The designation of critical habitat is intended to promote not only the survival but also the *recovery* of species. *See Gifford Pinchot Task Force*, 378 F.3d at 1069 (it "is logical and inevitable that a species requires more critical habitat for recovery than is necessary for species survival"). Third, at the time the statements were made by Dr. Rabinowitz, he was not considering the effect of designating critical habitat in the United States on the recovery of the species, as required by the ESA. Heavy reliance by the FWS on his conclusion that no area in the United States was critical for the survival of the jaguar is indicative that it unduly limited its consideration of the recovery goal of the ESA in making its determination, while focusing on the survival goal. Finally, the record reflects that later comments made by Dr.

Rabinowitz suggest a departure from these earlier statements.

In November 2000, for instance, Dr. Rabinowitz, along with scientists Brian Miller and Carlos Lopez, in responding to questions posed by the Jaguar Scientific Advisory Group, stated that "individuals on the fringe of the range can contribute to the metapopulation and of a species . . . all individuals of an endangered or threatened species are important whether they exist on the fringe or in the core of the historic range. The important issue is to restore connectivity throughout the range to allow movement between, and survival of, the now isolated individuals." RAR 1990-1991. The three scientists went on to state that a "viable population should not be measured as the number of animals living north of the U.S./Mexico border," and that while it cannot be predicted "whether any animals that live in, or pass through, the United States will be important or unimportant to long-term conservation of jaguars," "each animal should be considered important regardless of physical location," because it "is possible that populations from the fringe of the range may produce the last jaguars." RAR 1992. Finally, they concluded that "[o]utlining habitat that could be occupied by jaguars, and protecting that habitat through a combination of formal (legal) and informal (acceptance by people) means, would be an important step. It is critical that these habitats have connections that allow jaguars to move freely between patches, and to allow jaguars the potential to recolonize the southwestern U.S." RAR 1994-95. These last comments suggest that there may be habitat in the United States that is indeed essential to the conservation of the species, a conclusion drawn by other jaguar researchers as well.

As to transience, for instance, scientific evidence exists that the jaguar has been a permanent resident of the United States.[7] A 1989 study by David Brown entitled "Cat Fever" indicated that there is strong evidence to suggest that the jaguar was historically a permanent resident of the United States: "Plotted at ten-year intervals, the numbers of jaguars reported killed in Arizona show a decay curve characteristic of an over-exploited resident population. If Arizona jaguars were the sole result of incursions from Mexico, the pattern of kills would always have been erratic and irregular."[8] CAR 749-50. As to lack of breeding activity as a rationale for declining to designate critical habitat, the FWS has admitted that this situation could "change at any time."[9] CAR 289. As to the importance of fringe populations, a 2005 journal article published by Erin Boydston and Carlos Lopez-Gonzalez concluded that "[r]ange expansion could help prevent genetic isolation and extinction of the northern jaguars and also increase chances for long-term

---

[7] In its opening brief the FWS acknowledged that "some male jaguars may reside permanently in . . . the United States." Def's Cross-Motion at 12.

[8] The assumption that the jaguars observed recently in the United States were mere transients was obviously crucial to the FWS conclusion that "[l]oss of or threats to features in the United States that may support these sporadic foraging events is not limiting the recovery of the species."

[9] 50 C.F.R. § 424.12(b) provides that the Secretary "shall focus on the principal biological constituent elements within the defined area that are essential to the conservation of the species," not merely specific and limited behavioral characteristics of the species in question. Quite apart from breeding sites, critical habitat considerations include "(1) Space for individual and population growth, and for normal behavior; (2) Food, water, air, light, minerals, or other nutritional or physiological requirements; (3) Cover or shelter . . . [and] . . . (5) Habitats that are protected from disturbance or are representative of the historic geographical and ecological distributions of a species." Even without observed breeding activity, critical habitat would provide significant conservation value, especially in light of the fact that, as the FWS admits, breeding could occur at any time in the near or long-term.

survival of this species in the face of global anthropogenic change." RAR 5028. The same authors concluded that habitat exists in the United States to support both male and female jaguars, and therefore presumably jaguar reproduction. RAR 5026.

The FWS was required to make its determination based upon "the best scientific data available." 16 U.S.C. § 1533(b)(2).[10] To this end the FWS relies upon two later studies, the 2002 "Planning to Save a Species: the Jaguar as a Model," and the 2005 "Jaguars in the New Millenium Dataset Update: The State of the Jaguar in 2005," to support its conclusion that no critical habitat for the jaguar exists in the United States. The former stated that "[s]aving jaguars requires international, range-wide planning" and identified fifty-one important areas for jaguar survival, called jaguar conservation units, none of which included portions of the southwestern United States. SAR 995-1010. The latter identified areas most threatened throughout the jaguar's range as being in northwest Argentina, central and east central Brazil, areas of Bolivia, and central Guatemala; this study also failed to name any area in the United States as a high-priority conservation territory for the jaguar. SAR 723-784. In reaching these conclusions, however, these scientific advisory groups were not applying ESA standards regarding whether critical habitat exists for the jaguar in the United States.

The FWS may not base a determination on "speculation or surmise or disregard

---

[10] The FWS in its briefs seeks to bar what it views as post-decisional scientific evidence. Even if this evidence is precluded, it does not appear that the FWS based its determination on the best available science.

superior data." *Building Industry Ass'n of Superior California v. Norton*, 247 F.3d 1241, 1247 (D.C. Cir. 2001). Scientific documents exist in the administrative record to suggest that the designation of critical habitat may be appropriate for the jaguar, and more recent scholarship only seems to strengthen that conclusion. It appears that the FWS overlooked probative scientific evidence regarding its "not prudent" determination.

Congress intended the imprudence exception to be invoked rarely and only under extraordinary circumstances. *See Natural Resources*, 113 F.3d at 1126-27. It is not apparent that these circumstances are present here. The Ninth Circuit has rejected the notion that "designation is only necessary where it would protect the majority of species habitat." *Id*. at 1126. Because the FWS has failed to articulate a rational basis for invoking the exceedingly rare imprudence exception, its critical habitat determination must be set aside.[11]

*Recovery Plan*

Plaintiffs DOW and CBD challenge Defendant's decision not to prepare a jaguar recovery plan. Plaintiffs assert that Defendant's decision runs counter to the plain language of its own policy (contained in the draft Recovery Handbook), conflicts with its long-standing, bright-line distinction between foreign and domestic species in recovery planning, and is inconsistent with the ESA and its purposes. Defendants contend that, in

---

[11] The additional justification provided by FWS for declining to designate critical habitat is that it is currently providing significant protection for the jaguar in other respects. The Ninth Circuit has made clear that "[n]either the Act nor the implementing regulations sanctions nondesignation of habitat when designation would be merely *less* beneficial to the species than another type of protection." *Natural Resources*, 113 F.3d at 1127.

determining that a recovery plan would not benefit the species as a whole, they reasonably relied on the draft guidance and made a decision that was consistent with prior practice. Defendants further assert that their determination was compliant with the dictates of the ESA and was well within their ample discretion.

In its July 22, 1997 Final Listing Rule extending endangered status to the jaguar in the United States, the FWS explicitly rejected various challenges raised by entities opposed to the listing, challenges which included assertions that the "United States was merely peripheral to the [jaguar's] historic range," the "species was never more than wandering individuals that occasionally crossed the border into the United States," and "[n]o breeding population of the jaguar exists in the United States." 62 Fed. Reg. 39150. The FWS responded to these objections by stating that it believed the jaguar to be "native to the United States," with evidence strongly indicating "that the historical range of the jaguar included portions of the southwestern United States." *Id*. The FWS further responded by noting that the "issue of whether a breeding population is wholly supported within the United States is not relevant," concluding that the mere "fact that individuals occur in the United States warrants their consideration for listing, evaluation of relevant threats, and development of appropriate conservation considerations." *Id*. The FWS at that time concluded that the ESA required the protection of domestic jaguars, and explained its decision in detail:

> The Service has carefully assessed the best scientific and commercial information available regarding the past, present, and future threats faced by this species in determining to make

> this rule final. . . . A decision to take no action would exclude the jaguar in the United States from needed protection pursuant to the Act. A decision to extend only threatened status would not adequately express the drastic distributional decline of the species and the continued jeopardy of any individuals in the United States. Therefore, no action or listing as threatened would be contrary to the intent of the Act.

*Id*. at 39155.

In its December 21, 2007, 4(f)(1) Determination Regarding Recovery Planning for the Jaguar (*Panthera onca*), the FWS concluded that a recovery plan for the jaguar was not warranted, because "actions taken within the United States are likely to benefit a small number of individual jaguars peripheral to the species, with little potential to effect recovery of the species as a whole." SAR 572. The FWS concluded that "[a]lthough the jaguar is not an exclusively foreign species, for the purposes of formal recovery planning, it qualifies as such." SAR 573. The FWS noted that because the "jaguar's range extends through the jurisdictions of approximately 20 countries from the United States border through Mexico, Central and South America" and because "the area represented in the United States and northern Mexico is not large enough to independently provide for the conservation and recovery of the species," a recovery plan would not promote the conservation of the species, as "[a]ny conservation actions for the jaguar that may bring the species to the point that the measures of the Act are no longer necessary will need to be implemented throughout Mexico and Central and South America." SAR 573-574.

Based upon the record in this matter, the FWS determination not to prepare a recovery plan for the jaguar must be vacated and this matter remanded for further

consideration.

<u>The FWS Determination Not to Prepare a Recovery Plan is Inconsistent With its Own
Policy Guidance and its Long-standing Practice Regarding the Distinction Between
Foreign and Domestic Species</u>

Drawing upon its draft guidance, the FWS relies upon the foreign species

exemption to justify not preparing a recovery plan for the jaguar.  The exemption applies

to a species if its "current and historic ranges occur *entirely* under the jurisdiction of other

countries, i.e., it is a foreign species."  SAR 1040 (emphasis added).  While an agency's

interpretation of its own regulations will generally be afforded deference by a court, such

deference is not absolute.  *Regents of University of California v. Shalala*, 82 F.3d 291,

294 (9th Cir. 1996).  The Ninth Circuit conducts a two-pronged analysis to determine

whether an agency interpretation is lawful: first, a court will look to the plain language of

the regulation, which must be "reasonably susceptible to the construction placed upon

them by the Secretary, both on their face and in light of their prior interpretation and

application"; second, a court will insure that the agency's construction is "consistent with

and in furtherance of the purposes and policies embodied in the Congressional statute

which authorize them."  *Id* (internal quotation marks and citations omitted).  In this case,

the FWS interpretation is erroneous.[12]

In reaching its decision, the FWS overlooks the word "entirely," arguing in its

_____

[12] The FWS contends in its Reply that *Shalala* does not provide the correct standard of
review, and that the "plainly erroneous" standard should be applied here.  *See Long Island Care at
Home, Ltd. v. Coke*, 127 S. Ct. 2339, 2349 (2007).  Even if this standard were to be applied,
however, the result would remain unchanged–the FWS interpretation of its own draft guidance is
contrary to the clear meaning expressed therein and is plainly erroneous.

-29-

brief that its interpretation of the exemption is reasonable because "the jaguar is the functional equivalent of a foreign species." Def's Cross-Motion for Summary Judgment at 27. As a matter of plain meaning, however, the jaguar is clearly not a foreign species, and thus the foreign species exemption does not apply. Moreover, as to prior application, it would appear that while the FWS has never prepared a recovery plan for a foreign species, it has exempted only 11 domestic species from recovery plan requirements since the ESA was promulgated. *See* SAR 571. Furthermore, it appears that the FWS has yet to exempt a species from recovery planning on the basis that its domestic range is limited or is largely international.[13] Past practice suggests that the FWS has consistently extended recovery plan protections to other transnational species, even those with limited domestic ranges.[14]

The FWS also argues that the "other circumstances" exemption applies because

---

[13] In circulating a draft memorandum for exempting the jaguar from recovery planning, an FWS Endangered Species Coordinator acknowledged that she could not "come up with any pre-existing examples to follow for any of the currently exempted species, so we are on our own." SAR 516.

[14] The FWS has prepared or is preparing recovery plans for species such as the grizzly bear, the gray wolf, and the Canada lynx, which are present in both the U.S. and a neighboring nation, but listed as threatened or endangered only in the U.S., despite the fact that all these species have extensive ranges in foreign nations and often exhibit limited domestic ranges. *See S.W. Ctr. For Biological Diversity v. Norton*, 2002 U.S. Dist. LEXIS 13661, at *40 (D.D.C. July 29, 2002). The FWS has also prepared recovery plans for transnational species that are listed in both the United States and one or more foreign countries, despite the fact that many of these species also exhibit limited domestic ranges; the FWS has, for instance, prepared recovery plans for species such as the Mexican gray wolf, the Mexican spotted owl, the ocelot, and the Sonoran pronghorn. *See* Declaration of Andrew Hawley, Pl.'s Ex. 5 (including attachments A-G, also available at U.S. Fish & Wildlife Service, Endangered Species Program, http://www.fws.gov/endangered/recovery/index.html).

the jaguar's situation is unique and not easily foreseen, as the resident U.S. jaguar population is so small, the jaguar range traverses so many foreign jurisdictions, and the U.S. portion of the jaguar range is so minimal.  This exemption, however, much like the foreign species exemption, is inapplicable here based upon plain meaning and prior practice, as the FWS explicitly anticipated such situations in its Recovery Handbook, providing guidance in the  "Special Considerations" section as to how to implement recovery plans when multiple nations are involved.

In promulgating the ESA, Congress found that "various species of fish, wildlife, and plants in the *United States* have been rendered extinct as a consequence of economic growth and development untempered by adequate concern and conservation."  16 U.S.C. § 1531(a)(1) (emphasis added).  The Act was designed to "better safeguard[], for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants." 16 U.S.C. § 1531(a)(5).  In *Defenders of Wildlife v. Babbitt*, 958 F.Supp. 670, 684-85 (D.D.C. 1997) (internal quotation marks and citations omitted), the FWS sought to justify not listing the Canada lynx as threatened or endangered on the basis that the species remained "plentiful in Canada and Alaska and it is not threatened with the possibility of extinction" in those areas.  The court rejected this argument, noting that "the FWS cannot be allowed to dismiss the contiguous United States population of a species merely because it is plentiful elsewhere."  *Id.* at 685.  When the FWS argued that the lynx did not deserve protection because it was a mere remnant population, the court noted that this argument was inconsistent with prior FWS practice, which had seen the listing of the grizzly bear, the

eastern timber wolf, and the woodland caribou under the ESA, even though these species also exhibited remnant U.S. populations. The FWS recognized in those instances that the remnant nature of the species' population argued for, rather than against listing, to protect "the species from further depletion." *Id*. Although the lynx case involved a listing decision, the same logic applies here. *See also Defenders of Wildlife v. Norton*, 258 F.3d 1136, 1145 n. 10 (9th Cir. 2001).

The reliance by the FWS on both the "foreign species" exemption and the "other circumstances" exemption to justify its refusal to prepare a recovery plan for the jaguar is not supported by the record and, as the determination represents a failure to articulate a rational basis between the facts found and the choice made, it must be set aside.[15]

## Conclusion

**IT IS ORDERED** that Plaintiffs' Motions for Summary Judgment (Doc. Nos. 44& 45) are **GRANTED** in **PART** and **DENIED** in **PART**. The FWS determinations to not designate critical habitat or prepare a recovery plan are set aside, and this case is remanded to the FWS so that it may, consistent with this opinion, consider whether to designate critical habitat and prepare a recovery plan for the jaguar. The FWS shall make a determination as to critical habitat and recovery planning by **January 8, 2010**.

**IT IS FURTHER ORDERED** that Federal Defendants' Cross-Motion for Summary Judgment (Doc. No. 53) is **DENIED**.

---

[15] The Court expresses no opinion or conclusion in this matter regarding the construction of vehicle or pedestrian impediments along the international border.

**IT IS FURTHER ORDERED** that the Clerk of Court issue judgment accordingly

and close the case.

DATED this 30th day of March, 2009.

_____
John M. Roll
Chief United States District Judge